Mr. Kirk, please call the next case. 3-12-0392, J.R. Hemminger, et al., al-Qaida, Ward Center, Cream, v. Jeffrey Lemay, M.D., et al., M.D. by Timothy Shelton. Mr. Cream, you may proceed. Good morning. Good morning. I wanted to address something at the outset that, when I read my briefs, I realized I didn't make as clear as I wanted to. And that is the issue of the defendants claiming that our expert testified that she did not know whether the outcome would have been any different had treatment been instituted earlier for this cancer. That's not what she testified to. What she testified to was that she did not know how Tina would have responded to treatment. And I submit that's not the same thing. It's not the same thing as whether she would have survived. Response to treatment can mean, would they have had to get a chemo in more cycles? Would they have had to change the drugs? Would they have had to up the doses? Would she have had side effects? That's not our burden of proof. Our burden of proof is, would she have survived? Which is a different question, which was not asked at that point. It was asked otherwise. And on survival, Dr. Pfister was unshakable. She said that Tina lost a significant chance of survival, that if this was a stage 2 cancer, she lost a 26 to 29 percent chance of survival in stage 1, 48 to 58 percent chance of survival. And that's true, even if we don't know what the response to treatment is. Holton doesn't require that we prove what the response is. It requires that we prove there's a lost chance of recovery. And the trial court apparently believed, and as the defense argued, that Dr. Pfister, when she was talking about a response, was talking about outcome. And I would submit to this court that if reasonable minds can differ as to what that means, does the response mean treatment? Then under the law, in ruling on a motion for directed verdict, you must adopt the construction most favorable to us, to the plaintiff, which is that response to treatment is not the same thing as survival, and that you look at the totality of the evidence. And we met our burden of proof. There was a question of fact. Everything that they cite as deficiencies in Dr. Pfister's testimony, I submit, goes to the weight and not to the ultimate conclusion. A jury should have decided this issue. And under Holton, we don't have to know what the response is. As a matter of fact, when the Supreme Court decided Holton, they did so recognizing that nobody can know what the response to treatment is. And for that very reason, the Supreme Court said we're going to allow recovery for a lost chance of survival because doctors don't know and can't know in advance who's going to survive and who isn't. So they treat everybody, even those that don't have better than a 50-50 chance of survival. And the court says that if you can show, within a reasonable degree of medical certainty, that there was a decreased chance of survival, then you're entitled to have a jury decide that, and that is compensable. And I would submit we met our burden to show that. The risk of harm created by the defendant's negligence was realized when Tina died. It deprived her of this chance of survival. That's all that Holton required, and this court asked not to impose any further burdens because if you adopt what the defense is suggesting here, it's going to make it almost impossible to prove causation in a failure-to-diagnose-cancer case. Well, what about this question and answer? But you're not, and they were talking about, she talked about all the variables going to whether somebody survives or not. And it says, but you're not, you don't have this, enough expertise to apply those additional variables to the survival rates to tell us what Tina Heminger's survival rate was either in June or September or December, correct? Answer, correct. I have two responses. The first is that's irrelevant unless and until we know whether Tina's cancer had any of those factors. Unless and until there was evidence that Tina's cancer was of a particular cell type, which they were asking about, or I forget the different variables, but there wasn't any evidence that Tina's cancer had any of those factors. Well, it had one of the factors. It was either a small cell or a large cell. No, it was moderately differentiated. It was the only one that they had. And that, I submit, in part goes to the weight of her testimony. It doesn't knock everything out of the box. If there was evidence that this was a small cell, it was keratinizing, it was all these other things, and then Dr. Pfister said, I don't know, that might be different. The second response to your question is the FIGO staging criteria, which is part of the basis for Dr. Pfister's opinion, takes that into account because it's based on all comers, all women with surgical cancer, all different cell types, large cell, small cell, moderately differentiated, whatever, and it has determined that all of those women, if given prompt treatment, have similar outcomes. And once you have that, these other things go to the weight. I submit this case is no different than the Mahler case that I cited, where the plaintiff's expert in that case said, I can't tell you if the growth rate of the tumor plays any role in whether it's curable or not, but what I can tell you is this patient had a better chance of survival being treated in February than she did in June. And if you look at, and I tried to detail this fairly closely in my brief, the similarities between Mahler and our case, where the court said, you know, that all goes to weight, not admissibility, and that all we have to do is get the opinion out there, the burden is then on the other side to cross-examine and try to show that there's holes in it, and then it goes to the weight of that testimony. And the jury should have decided this. You can't have the court, as a matter of law, conclude based on that question that there's not enough for the jury to decide. That's not what Mahler did. And so, you know, Dr. Pfister talked about, you know, there was another issue that the defense raised about what the treatment would have been, and there's no dispute on what it would have been. She would have had chemotherapy, radiation, maybe surgery. And the issue is not what the treatment would have been. The issue is it wasn't started soon enough. Same as in Mahler. Treatment would have been the same in Mahler whenever the cancer was discovered. It's just that it's almost common sense. The earlier you start it, the better the chance that you have. And with the FIGO staging system and the American Cancer Society statistics, the accuracy of which, by the way, were never challenged below, we know that most women have similar outcomes. And that's enough under the cases. There were other issues about, you know, how the Dr. Pfister arrived at what stage cancer this was. And she did it by making a differential diagnosis, which is whatever a doctor does, how they're taught. You list what you think might be the likely causes or the likely diagnosis. You do your tests, and you progressively rule in or rule out things until you come to what the most likely diagnosis is. And that's how she arrived at her opinion on the stage of the cancer. Exactly what they did in the Mahler case. And in the, I'm going to mispronounce this, Matusak case, this court decided, specifically approved of that method of an expert making an opinion, of making a differential diagnosis. You don't have to rule out every possible thing. You go through it, and that's what she did. I wanted to also touch on this gap in causation cases, as I call them, that the defense relies heavily on. And there's three principal ones, and they are Townsend, Wiedenbeck, and Aguilera. The key to these cases is there was a test that was allegedly not done that would have led to treatment that would have altered the result. But the expert had to admit, I don't know what the test would have shown, or I know what the test would have shown, but we need to know if the patient would have been a candidate for treatment. In that context, when the court says, if your evidence is sooner is better, that's not good enough, you have to understand that. In this case, we don't have a situation where we don't know what the test result would have been. We know she had cancer. It was a given below. We know what the treatment would have been. We know she would have gotten the treatment. It's not a situation like in Townsend. Didn't your expert say she didn't know exactly what the treatment would be? It might be surgery. No, she didn't say that. She said that the treatment would be chemotherapy, radiation, and perhaps surgery. I'm not saying this the way I want to. I'm sorry. In Townsend and in Wiedenbeck and in Aguilera where there's a test, your expert says, they should have ordered a CT. What would have come? I don't know. And then you say, but it would have gotten her treatment sooner. Well, then there's a gap. Sooner, if there's this gap there, then sooner is better isn't good enough. But in this case where we know she had cancer, we know she was a candidate for treatment, we know the treatment would have been given, then evidence that sooner is better is proof. That's what Halton is. Well, wouldn't you have done yourself a favor to have used this expert for standard of care and brought in an oncologist for a causation? I think she was quite well. Two responses to that. One, the defense challenged her qualifications below a loss on that issue and didn't raise it on appeal. So we're not here talking about Dr. Pfister's qualifications and the causation of cancer. Secondly, the plaintiff, my understanding is, did have, I wasn't traveling, the plaintiff did have a gynecological oncologist as a rebuttal expert. Unfortunately, we never got that far. And I submit that had we allowed the plaintiff to go to the jury on this, as it should have happened, the jury is the one who should have been weighing these attacks on Dr. Pfister's testimony that the defense is pointing to. Because as Halton instructs, approximate cause questions are typically questions of fact, they're very case specific, and you cannot have a court weighing facts, judging credibility, and deciding whether this should go to the jury or not. And so we're not in that situation. You had a situation where you have a physician whose opinion on the staging of a cancer isn't really challenged. There's no issue on what the treatment would have been. And we have testimony from a very experienced gynecologist that starting treatment would have increased this patient's chance for survival. Maybe the jury didn't buy it, but they never got that chance. And I think that they deserve that chance, that we showed more than enough to take this case to the jury, and I'm asking this court to send this back to trial and give Tina's family their day in court. We were here once before where the pap smear was misread, and the law gave that cytotechnologist a pass under the Tort Immunity Act, and the law should not send Tina's family away again without giving her a day in court, and that's all that we're asking for. Let's go back to your distinguishing the two cases, Townsend and Wiedenbeck, on the basis that they really don't stand for a general sooner is better insufficiency. Not quite. Because those two can be seen to be a block to your argument here. Well, they do say if all you have is sooner is better, that's not good enough. But you have to understand the context of those cases. In Townsend, the issue was the patient had a urinary tract obstruction, and the claim was you should have done an ultrasound, you would have found it, that would have led to intervention that would have increased the patient's chance for survival. And that particular witness said, you know, I don't know what the treatment would have been, I don't even know if it would have, and the court said you don't even know if the treatment would have been indicated. Was the patient even a candidate for it? Under those circumstances, sooner is better isn't good enough. In Aguilera, Aguilera-Wiedenbeck, I'm getting them confused, the patient had a cyst in her brain, and the claim was you should have done a CT, that would have diagnosed the cyst, and a drain would have been put in to relieve the pressure and the patient would have lived. The standard of care expert said, I think a CT would have shown this condition, but I'm not a neurosurgeon, I don't know what the treatment would have been. They bring in a neurosurgeon who says, oh yeah, if you had put this drain in on time, you would have saved the patient. Would the CT have shown this cyst? I don't know. So you have a disconnect, where you have evidence that a test should have been done, but no evidence of what the test would have shown, and no evidence that the patient was even a candidate for treatment. Under those circumstances, sooner is better isn't good enough. But when you have our case, where we know what the test would have shown, we know she was a candidate for treatment, we know what the treatment is, and the expert's opinion is she had an increased chance of survival if you start the treatment early. Then it's up to the jury, whether they believe that or not. I don't think that the Townsend line of cases governs this case at all. Thank you for your attention. Thank you, Mr. Krian. Mr. Shelton, you may respond. Thank you, Your Honor. Good morning. Excuse me. Tim Shelton. Good morning, counsel. I'm part of Dr. Lemay and Serling Rock Falls Clinic. Obviously, the question is whether the table, statistical tables about survival alone are sufficient to establish proximate cause in a medical malpractice case where the plaintiff is trying to show lessened chance of survival. There is not an Illinois case that says that table alone is enough. There simply isn't. The case that sets the standard most clearly and has never been responded to by the plaintiff is the Ayala v. Murad case, which we deal with, which is a very similar situation where a woman presented with cancer. They used the FIGO staging system, exactly as we used here, and survival rates, and they determined on those rates it was clear that just those rates alone, she would have had less than chance of survival. But the court held the evidence was insufficient as a matter of law to show that the alleged deviation from the standard of care resulted in a decreased chance of survival due to a delay in starting the treatment because they only talked in general terms about the FIGO staging system. They did not connect those statistics to this particular patient's case. And the expert did not testify, quote, as to what course of treatment for this patient would have been and how she might have done had she received treatment sooner. That is, these standards are followed in all of the cases to one degree or another. Either they tie specifically the patient to the tables through these, what we call for want of a better term, patient-specific factors, but something to do with that patient, or through mostly discussing treatment. In all the cases, Mahler very strongly states that the important part of the analysis is what treatment would have been done.  Had the tumor been removed when it was smaller because the expert explained precisely how a lumpectomy followed by chemotherapy would be more effective if the tumor were smaller. In other words, they talked very specifically. They talked about patient-specific factors at Mahler, the size of the tumor, the fact that the patient had no known metastatic disease and no lymph node involvement. These are the kind of questions that we thought should have been considerations, should have been addressed by a plaintiff's expert. And she did say, I'm not qualified to look at those. The burden was not on us to bring forward this evidence. Counsel said it just a second ago. The problem with the deal with the weight is get the evidence out there. I wrote this down as a quote. Get the evidence out there. Yes, they needed to get the evidence out there about this patient, why she tied into these general statistics, and then we could cross-examine it. They didn't get it out. It was kind of a reverse process. We cross-examined her during the case in chief and said, what about these things? Are these important? Are these important? All the various factors. I won't go through them, but the histological classification, general health, and so on. And she said, yes, she agreed. These are important because, she said, cancers grow differently in different people, and you can't predict how fast or slow a cancer will grow in any one individual. The FIGO staging system itself, counsel has brought forth this statement in the preamble about how they try to cover all kinds of patients and make sure that, well, that's a goal. That's a good goal to try to make sure they cover it. That evidence was never presented in the trial in their case. What is true is, and was presented in the trial, is the FIGO statistics. And then there's a statement right below it saying, these rates are based on outcomes of large numbers of people who had the disease, but they cannot predict what will happen in any particular person's case. Many other factors may affect a person's outlook, such as their general health and how well the cancer responds to treatment. Well, this is a lost chance of recovery, isn't it? Yes. Okay. She never got the chance to establish it in reality, how she would have responded at stage two or stage three. Did she? Or, I mean, the early stage. So what are we asking here? Well, we're saying that the jury, knowing there were various factors that go into how she might have responded, and she might have. Let me parse the word lost chance. Sometimes we're talking about lost recovery. Recovery is recovery. But the chance to recover, isn't that really the issue here? The chance to recover, but how do we determine the chance to recover for any particular individual? Don't we have to give the jury something more than just a table that says she might react the way the people in these numbers, her chances might be, chance, what these numbers show. More likely than not, huh? Well, they didn't present evidence to show more probably true than not. They just presented these figures. And that's where the court, all of the decisions in Illinois so far, have said not enough. We need a little bit more that says it is more probably true than not that this individual, not the general population, but this individual would have had these chances. These chances would have diminished for this particular person. So your view is that these are population aggregate statistics insufficient to establish their case? Yes, by themselves. By themselves. By themselves. And that the state of the law requires idiopathic or idiographic type of data. Something, yes, and something about her general health or history, something about what response to treatment is incredibly important. Whether she had a tumor that was growing sideways, what this whole notion that she mentioned treatment, I do want to reaffirm. She only said in the most general way, yeah, for these kind of things, you can have chemotherapy, radiation, and sometimes surgery is done early on or later. Well, of course. But what might have been done here? If anything, was she a candidate for intervention at all? We don't even know if she really was a candidate for intervention. Maybe the best thing would have been to give her some vitamins. You don't want to be silly. But, I mean, we don't really know at this point what would have been best for this individual, and could they have done the equivalent of a lumpectomy instead of a radical mastectomy, which is what happened in one of the cases, Walton, I think. But, you know, could they have done the equivalent of that, some sort of reduction of the tumor, some sort of draining of fluid, some sort of, or do they have to take out the whole vaginal wall? Do they have to take out her reproductive system? We don't, we have nothing to know what might have been possible that could have been done, should have been done that would make her, would connect the negligence of not diagnosing in June 2000 to these lost chance numbers. Something specific to tie it up. I do urge the court to look at the Ayala case. I'm not quite sure why we have not gotten a response to that, because they really do say, I mean, procedurally, they did the first in that case, because the expert was, the court thought, wrongly deprived of a chance to testify about other things through emotional illuminate. As counsel said, we tried emotional illuminate in our case before, and it didn't work. So Dr. Pfister was free to testify about anything, and just didn't go far enough, didn't tie the knots. This jury would just be left to wonder, to speculate. The plaintiff didn't have to prove that, but for the defendant's alleged negligence, that the plaintiff would have survived the treatment, right? No, that's not the standard you're right. Yes. But to prove that more probably than not, her chances of survival were lessened by these numbers, by lack of intervention at this early diagnosis stage. They do have to show something, something more than just throw up some numbers, especially when the numbers themselves, the authors of the numbers said, don't really take these too seriously, because they may not apply to you. Talk to your doctor. Find out how your individual situation applies. And Dr. Pfister acknowledged, this is general information, not specific individual information. A direct avertive is tough, but they had the opportunity to lay all the cards out on the table. They did, and then the last one, Proxima Causa was deficient. Just didn't carry that part, and that kind of destroyed the whole hand they were trying to play. Any questions? I don't believe there are, Mr. Shelton. Thank you. We request affirmation. Thank you. Thank you. Mr. Cream, you may reply. We didn't simply, or Dr. Pfister did not simply say, here's what the survival statistics are for this particular stage of cancer. She used these tables as part of the basis for her opinion, along with her education, training, experience, and her knowledge of the literature. And I cited a testimony in my brief where she says, the question to Dr. Pfister was, so her, meaning Tina's, chance for survival was, and Dr. Pfister said, well, if it was a stage 2, here's the range of what I think it is. She didn't just lay out the tables. I think that's a misconception. But think of this. I also cited you the Walton case, which is where the plaintiff's expert talked about, in other words, where a similar population of patients has a chance of survival of whatever the percentage was. And that, plus discussion of what the treatment would have been, was enough. And that, I submit, is what we have here. They bring up the Ayala case. And it's interesting that in the opinion, the Ayala court acknowledges what I'm saying about the FIGO statistics, about how it takes all comers, and how similar stages have similar results. That's why they're grouped together. But Ayala doesn't govern this case for a couple of reasons. First of all, the testimony that the plaintiff's expert was not allowed to give, the only testimony that they cite about that, and that's found at 36 Hill Ave. 3rd at 601, they quote from the Rule 213 disclosures of that expert. And this is all he says about causation. He says, The failure to diagnose and report invasive mucinous cancer and lymphovascular invasion in April 1998 resulted in an 18-plus month delay in providing chemotherapy and other diagnostic, potentially therapeutic treatment, substantially reduced Ms. Ayala's chance of surviving her cancer, reduced her life expectancy, lessened the effectiveness of treatment once it was finally initiated, and resulted in substantial medical expenses, pain, and suffering. That's it. That's what was missing in Ayala that the plaintiff's expert was not allowed to testify to. And that's what Dr. Pfister testified to here. Dr. Pfister said that she would have had chemotherapy, radiation, and maybe surgery. She did connect the FIGO statistics to this patient. She talked about her chance of survival, not, even as in Walton, a similar population of patients. They mentioned the disclaimer, and it's either the FIGO or the American Cancer Society information, that says that... And the other part is, other factors may affect the person's outlook. It doesn't mean that they will or they have to, or it's invariable that they might. It's a question of fact. It's also... So is that all you've got to put out there? What? The statistics? Yeah. It might. That's what the table says. You decide, Jerry. No. Because the table takes into account that if you are of a particular stage, most women have similar outcomes. As they say in the preamble, that's what gives this its validity. And Dr. Pfister's opinion was not just simply to come in there and read the table. She said, I've been practicing since 1982. Based on that, based on my knowledge of the literature, based on my experience with these women, and relying on these tables, here's my opinion. I'll tell you in one minute. Thank you. The issue here is survival, not the extent of treatment. Like they were talking about, was it a lumpectomy versus mastectomy? That's not the issue. Would she have survived? Was she deprived of a significant chance of recovery? We don't have to prove there was a better result, but that's what they're making us, in effect, try to do. And I would submit that it's not the law, it shouldn't be the law, and ask this Court to remand this case. Thank you. Thank you, Mr. Cream. And again, thank you, Mr. Shelton, for your arguments in this matter this morning. This matter will be taken under advisement, and a written disposition shall issue. The Court will stand in recess until 1.15.